18-1392 Sophos Inc. v. R. Post Holdings Inc. Do you sit down? Let's hear the Ford case first. Number 18-1018 Ford Motor Company v. United States. Mr. Sheehy. Good morning, Your Honors. May it please the Court, Mike Sheehy for the government, my colleague Bev Farrell is with me at council table, and I'd like to reserve five minutes, if I would, for rebuttal. To evade hundreds of millions of dollars. Mr. Sheehy. Yes. Let me ask you this. What's the government's position on what type of provision 8703 is? And let me tell you what I'm thinking. Is it EO nominee? Is it EO nominee that inherently suggests use? Is it principal use or actual use among those four? In our view, the provision is best understood like 8703 is understood as a principal use provision, Your Honor. But for the reasons stated in the brief, the court doesn't need to take a position on how precisely heading 8703 is denominated. That's true for a couple of reasons. It's true principally because of this court's decision in the Mabini case. So if we do EO nominee with a provision that's inherently suggesting use, you believe it comes out the same way? Yes, Your Honor. And, you know, the reason we know is because— Supposing we want to take a position. I'm sorry? Supposing we want to take a position to clarify what we think Mabini means. So the best answer in the government's view is that heading 8703 is a principal use provision. But it's a special principal use provision because it doesn't just talk about how the vehicles are used. It talks about the vehicle's principal design. Are you aware of other provisions that use principally designed formulation? There's not that many, Your Honor. And I think this court recognized as much in the Western States case. You know, the Western States case itself called out heading 8703 as being quite unique. And it's, I think, in virtue of the uniqueness of the text that Mabini prescribed the very precise holistic inquiry. 8903-99, it deals with rowboats and canoes, which are not of a type designed to be principally used with motors or sails. In that instance, the statute employs the word use when discussing what an article is designed to do. For 8703, what should we make of the fact that the heading doesn't say principally designed for the use of transporting persons? Not very much, Your Honor, because the court doesn't require Congress to specifically use the magic word use to call out a principal use provision. And so, you know, this wasn't in the briefs, but this court has said in various cases, such as the Aramont case, that even the use of the word for preparations for super stock, for example, that is sufficient to denominate a principal use provision. So I wouldn't accord very much significance to the absence of the word use. What would you say if Ford sold its product to a dealer intact, but with instructions on how to convert the vans into cargo vans, and the dealer then sold cargo vans to the consumers? Where would you fall on that? I want to give two answers to that question. And let me throw in another thought. Supposing that the dealer sold some as cargo vans and some as cargo vans. And so the reason that hypothetical is hard, and I don't want to get out in front of customs proverbial skis, as it were, is because Mayor Benny makes quite clear we need to look at all of the evidence here. There's not a lot of evidence other than, I guess, a couple of sentences in the hypo for me to really evaluate how that would come out. But in that hypothetical, it's hard, Your Honor, as I think you know, because all of the evidence is pointing in different directions. Can I ask you that hypothetical a little bit more tied to the facts of this case? So instead of selling nines and sixes and sevens, all Ford sells is nines, which I think you agree are passenger vans, or they're at least properly classifiable. Well, let's just assume they're properly classifiable as passenger vans. They're sold as passenger vans. The sixes and the sevens are the ones that are sold as cargo vans. That's what the contracts sell. So suppose Ford only sold nines and presumed that they're passenger vans, but for people that wanted it to be a cargo van, they sold an additional post-importation service of stripping out all the seats and everything else that made it a passenger van. But all that was done post-importation. And would customs make a difference between those that were sold as passenger vans and those that were sold with the post-importation service of stripping it out? Or would they all be classified as passenger vans? Because they were, at the time they came across the border, passenger vans. So a couple of things here on it. So first, again, assuming that the Connect Nine is properly classified as a passenger van. My understanding, based on my conversations with customs, is that other auto manufacturers do in fact do that. And customs does in fact treat those importations of those vehicles as vehicles principally designed for the transport of persons. And even though, however they're doing the selling and the contract, the contract documents distinguish between them as passenger and then passenger, but with post-importation services to transform them to cargo vehicles. Right. And the critical difference, I think, between that hypothetical and this case is that in that hypothetical, the vehicles are actually offered to consumers as passenger vans, and some of them can actually be used by consumers as passenger vans. So again, as I was saying to Judge Wallach, the evidence in that circumstance points in many different directions. The evidence in this case does not, and perhaps it would help if I could review this principle. Just one more question on that point. What would happen here then, and I understand Ford doesn't sell the 6s and 7s as passenger vans, but assuming that for some reason the 6s and 7s are substantially cheaper than the 9s, if somebody went on and contracted with Ford and said, I want to buy this as a passenger van, don't do the post-importation stripping out because even though it's lower level seating, it's good enough for me. And the contract documents show they're buying it as a passenger van. There's no post-importation processing. Would that be a passenger van? Again, Your Honor, it's hard to say, and the reason it's hard to say is we need to see what percentage of the vehicles are purchased for use as passenger vans, what percentage are purchased not. In that hypothetical, it seems as if only some people might be using the vehicle as cargo vans, and the vast majority of people might be using it as a passenger van. And so that would be quite relevant in figuring out how to classify that vehicle. What it was principally designed for. Yes, absolutely. I'm not sure that's right, that you looked at the percentage of consumers who are using it one way or the other. That seems to me to be a bit odd. We have a situation here in which the design is that it's always going to be stripped out. There are not going to be any vans that are sold as passenger vans. So to make a determination turn on whether it's 51 percent one way or the other, I guess that's another case. But it seems to me that the actual preferences by the consumers may not be cranked into determining what it's principally designed for. I agree, Your Honor, that there isn't a precise numerical inquiry. But Marabeni makes clear that how the vehicle was used by consumers and the expectations of consumers is quite relevant to the inquiry. And that's because the court held that the Court of International Trade in Marabeni, quote, carefully applied the proper standards to determine how to classify the vehicle as the Nissan Pathfinder. And there, the Court of International Trade took testimony from three principal design engineers about how Nissan wanted to appeal to ordinary buyers. They looked at evidence of off-road use, market studies indicating what buyers used the vehicle to do and wanted the vehicle to do. And indeed, the judge even took the vehicle on test drives. And so when Ford says that Marabeni requires customs and courts to blinker themselves to all of that evidence, that reading of Marabeni simply cannot be reconciled with what the court actually held, which is all of the evidence is quite relevant. And it's true, Your Honor, that on the margins, it sometimes is difficult to figure out, you know, what a vehicle is principally designed to do. And, you know, as to that, I can only say that the test is whether the intended purpose of transporting persons outweighs unintended purpose of transporting those. Let me throw this at you. In the red brief at 70, Ford says, importantly, ellipsis, customs adduced no evidence calling into question that the CRS V2 is a seat and offered no expert opinion regarding the nature of a seat. And then they say, Ford, in contrast, introduced evidence that it was designed, I'm paraphrasing, through physical testing and engineering judgment to be a safe and usable seat. They cite 15 and 16 of their brief for that underlying purpose. And that cites Appendix 4856. Yep. So all that means is that Ford made the internal self-certification that the cost-reduced seats version 2 were safe under the NHTSA standards. And in this litigation, the government hasn't challenged whether the seats are or are not safe. But customs did point to a lot of evidence indicating that the cost-reduced seats version 2 were not designed for passenger use, not least because there was an email from a Ford design engineer saying, you may be wondering why we took all of the things out of this seat. Don't worry. The seat is designed to be scrapped. It will not be used. And that's quoted in the Court of International Trade opinion, Your Honor. And moreover, customs adduced evidence that, for example, they took out four of seven seat back wires, which are necessary for comfort. I'm interested that you say you're not contesting that because when I go to the appendix, which is customs responses, it sure sort of looks like you're not accepting it. So the answer, Your Honor, is I don't know whether or not the seats are NHTSA compliant. As far as I know, nobody has actually tested the seats other than Ford to figure out whether they're NHTSA compliant. But whether the seats are or are not capable of safely transporting persons is not the end of the Maribyrney inquiry. With the panel's permission, I'd like to reserve my remaining time. I have one more question. Oh, of course. And that is, is it your position that even if the tariff classification here didn't have the principally designed language in it, that this case would come out the same way because of the artifice theory? Yes, Your Honor. Because, again, this is a principal use provision. And in assessing... Let's say that we said that that's a eonominate provision. Would it come out the same way? That's harder, Your Honor, but I think it still would. And the reason it still would is because, you know, as Maribyrney makes clear, in assessing this eonominate provision, again, the entire battery of evidence needs to be considered. Yeah, but I don't think that's really answering my question. I'm giving you a hypothetical where the tariff provision is written differently and it doesn't have the principally designed for the transport of persons language in it. It just said passenger vans. And then the same process here. They strip out the seats in all the vans before they sell them to the customers. Would then that still be classified as vehicles for transport of goods? Probably, Your Honor, because passenger van is still a principal use provision just as the actual tariff is. But what if we say it's not a principal use provision? We say it's an eonominate provision, but there's... In other words, is your artifice theory, would it extend to a tariff classification written that way? It doesn't need to, Your Honor. Perhaps this answer might help with a different hypothetical. Suppose 8703 did not say principally designed for the transport of persons. It just said vehicle with four seats, right? And so Ford enters the Connect 67 with the cost-reduced seat in the back, right? In that circumstance, it would be a lot harder for customs to say that this is not a vehicle with four seats in the condition as imported. Whether or not the seats are taken out... I'm sorry, you're not answering my question. Let me try again. The tariff classification doesn't have the principally designed language in it. It just says vehicles for transport of persons. But they still do the stripping out immediately after the importation. None of them is sold to a customer with the passenger configuration in the van. Would that still fall into your theory that this is an artifice and that it would be in the cargo classification? Yes, Your Honor. So assuming that hypothetical exact same facts as here, except the only difference, instead of principally designed for the transport of persons, the tariff text says passenger, right? Assuming that the tariff text of passenger should be interpreted in the same way where evidence of use can be considered, evidence of marketing intent can be considered, that doesn't make a difference. The outcome would be the same. Okay, all right. We'll give you a couple minutes for rebuttal. Thank you, Your Honor. Mr. Keisler? Thank you, Your Honor. May it please the Court. I'd like to begin if I may. Well, I'd like to start with page 16 of your brief and your reference to 4856, which is where I worked backwards when I was asking the government. Because in that, you say, in addition to satisfying the HDSUS, your safety standards, seat belt and so on, thus ensured the Transit Connect 6-7s would be street legal in case one was sold in its condition as imported. And you cite me to 4856, which appears to be the government's responses. Am I correct? That was probably the government's responses to our statements of undisputed facts. Okay. And in it, they say that they aver that the cost, I'm looking at 71 and 72, avert that the cost-reduced second seat incorporated into the merchandise was not tested, either by Ford or the United States to comply, to determine whether it complied with U.S. safety standards. And then in 72, averse that if the cost-reduced second row seats were not removed, not only would the VINs be incorrect, but so too would the vehicle weight calculations on the safety certifications. Now, how does that provide the material to support what you said? Let me separate out two things with that, Your Honor. One is the safety of the seat and the other is the certifications. But in terms of the process that Judge Barnett followed here with respect to these undisputed facts, he took both sides' statements and responses and he prepared a draft statement of undisputed facts, which he then submitted to the parties, and the parties then said, yes, that's good to go, because he gave them the chance to refute them. So everything, his extensive factual findings based on that undisputed record, were essentially signed off by both sides. And to explain then why there is no inconsistency. No, then explain why do you cite 4856 instead of that? Well, we probably should have cited that instead, Your Honor. But in terms of the judge's findings, the seat was safety tested by Ford using both engineering judgment and physical testing. There's something called H-point testing, which makes sure that where the person sits in the seat hasn't changed as a result of any of the cost reductions that were made. And so through both engineering judgment and physical testing, Ford established that the seat complies with all federal safety standards. And this was summary judgment. The government never produced any evidence to the contrary. So, yes, when we stated it, they refused to concede it, but they never produced any evidence controverting it either. And if I could, I'd like to also address the first question Your Honor raised about what kind of classification this is. Because although the Council of the United States... A, it's a principal use provision. That is inconsistent with the position that... Well, let's assume it's a nominee provision, okay? We still have cases that say that use could be relevant, including particularly the Quan Quan case. And you say this is legitimate tariff engineering. But none of the cases that you cite involve tariff provisions with language similar to this or the principally designed feature to them. Why shouldn't we just simply say principally designed means what you intended to be for and that Ford intended these vans to be for cargo and not passengers? And why isn't it that simple? Because, Your Honor, design and use are different concepts, and Marabeni construed them to be different concepts. In this case in particular, Marabeni did refer to the vehicles intended for us in the language of the government of science. But in the very next sentence, Marabeni said, to make this determination, we look at the objective, structural, and auxiliary physical features. Yeah, but that case didn't involve this situation at all. I wasn't speaking to this situation. It didn't, but it could have looked to the subjective intent of the manufacturer. Well, it could have, but that doesn't mean it's a holding that informs us here as to what we should be doing. It's just not addressing whether principally designed for passengers means that if you intend to strip out the passenger features, that that's not going to be relevant to the tariff classification. I think there are two lines of cases that are relevant here. One is Marabeni, which construed the principally designed language to specifically focus on the objective physical features at import. And the other are the cases like Citroen and Worthington and the other Supreme Court cases which establish that you look at the condition as imported to assess the proper classification. So there are really two questions. One is what do you look to? They are not mutually exclusive in the slightest. They are not, but in the cases in which this court has looked to use to inform classification of an AO nominee provision, it has always been to look to use to understand the nature of the article as imported in its condition as imported. There is no case. There is no case. What case do you have where principally designed language has been held to exclude a consideration of the importer's intent with respect to the use of the item? The Western States import case would be that case, Your Honor. It was subsequent to Marabeni, and it involved classifications that distinguished between road bikes and mountain bikes. That also used, it didn't use the word principally designed, but the tariff classification used the word designed. And the court in that case looked to Marabeni to understand what the word designed mean and specifically said that Marabeni required a balancing of design features to determine what is principal, and then it rejected the importer's argument that the court should instead look to the importer's intent as to the subsequent use by the consumer. Okay. Let's assume that I don't agree with you, that that case helps you. What other cases do you have? Well, there's no other case that we're aware of that construes a principally designed tariff heading. There aren't other principally designed tariff headings to our knowledge. In the Blue Brick at 23, the government argues Ford did not give consumers the option to purchase the 6 or 7, the 6-7, Connect 6-7, with rear seats, let alone the option to purchase with a temporary cost-reduced seat. Is that correct? That's correct. Is the Transit Connect 9 marketed alongside the 6-7 so that the consumer sees both products together and chooses? In the case of the entries at issue here, they were ordered in advance. So when they came off the lot and went to the United States, they were already designated for a particular customer. And, in fact, Ford has a contract with a processor to undertake post-import processing for all the 6 and 7. That's correct, Your Honor. If that's so, then isn't it true that Ford could never sell a Transit Connect 6-7 with rear seats? Well, we haven't sold a Transit Connect 6-7 with rear seats, but we could. They were built with the intent that they would be passenger vehicles that could later be converted for cargo use. If nobody's going to ride in it, why does it have seat belts? Well, because we were seeking to build a passenger vehicle that could be completely street legal and driven as a passenger vehicle. We were seeking to build a vehicle that, in its condition as imported, would be a passenger vehicle and would meet each of the requirements of the explanatory notes, which included seat belts. What evidence in the record do we have that the seats actually met U.S. safety standards other than your conclusions, internal conclusions? The uncontested evidence from Ford that its engineers engaged in physical testing and engineering judgment to so certify it, and the absence of any contrary evidence by the United States. What is all this evidence about putting seats in there and perhaps making them compliant with safety standards have to do with principally designed when the whole purpose is that this is going to be ripped out and it's never going to be used? I mean, I think that turns, Your Honor, on the understanding of what principally designed means, whether it means the intent as to how the vehicle will ultimately be used or whether it refers to the physical design features. And if I may just go back to how Marabini has been construed, it's not only the Western States import case, Your Honor. It's the explanatory notes that the United States proposed and negotiated to the World Customs Organization to capture the holding of Marabini, which speaks exclusively in terms of physical design. But it's not dealing with this kind of situation where there's an intent to rip out the seats. Right. I mean, and none of the constructions of Marabini involved that kind of situation. That's right. Nobody foresaw that this might happen at the time of Marabini or until this case came up, right? And for that circumstance, Your Honor, we look to cases like Citroen and Worthington, which established that even when there is an intent after importation to convert the article into something else, that intent is irrelevant because the condition is important. It's irrelevant perhaps in those cases because there wasn't any principally designed language. Isn't it a better understanding? I know you're going to disagree with this, but it seems to me the better understanding, even though you go through and cite all these structural features that make it mean it could be a passenger vehicle, is that these were specifically designed for stripping out. These are cheap seats. You went through and reduced them to what you thought were the bare minimum to meet the Marabini requirements and the explanatory notes, but they were never designed to be passenger seats in actuality. They were designed to be stripped out at the lowest possible cost. Well, Your Honor, you're right that I would disagree with that. They were designed to be passenger seats so that the vehicle at importation would be a passenger vehicle, fully able to function as a passenger vehicle. The question isn't whether the tariff provision doesn't talk about whether the seats are designed to be passenger seats. It's whether the vehicles are principally designed for the transport of persons. And when you have seats that were done, even though they meet the passenger requirements, the vans were designed not for the transport of persons because the seats put in were intended to be stripped out. It's not a post-importation decision. Everything about this van was designed to be a cargo van. Your Honor, I very much disagree with that because the government has described this as if we simply took some seats and bolted it into a cargo van. Everything about the structure of this vehicle is a passenger wagon. Well, wait a moment. But isn't Judge Hughes correct that at the time that these were produced and designed that the intent always existed to strip out the seats? Absolutely. That they were just there to be temporary. And we've always been open about that, that the intent of this was to import a vehicle that met all the standards for a passenger vehicle and then use labor and facilities in the United States after importation to convert it for cargo. Your conversion facilities strip out those seats and destroy them. Isn't that correct? I'm not sure whether they're destroyed or recycled. My recollection of the record is they're destroyed. It may well be. Supposing Ford simply wired a bale of hay into the back and its engineers said, nope, that meets the safety standards because we've got a seat belt in there and it's solid enough. But then the engineer would have perjured himself or herself and the government would be confused. Oh, I don't know that. That a bale of hay would meet the federal safety standards. I used to ride around on a bale of hay when I was a kid. The government would not allow us to sell you a vehicle with a bale of hay today. That's right. I mean, this seat is a, I mean, I understand that there's a Supposing Chevy advertised and said, hey, don't buy this mongrel vehicle. It was designed as a passenger vehicle and it's not really a cargo vehicle. Would you have any beef? Well, we're not selling the vehicle as a passenger vehicle, so those kinds of advertisements wouldn't arrive. I mean, I think the question is, first of all, is this a vehicle that you examine in its condition as imported or do you look to the intent? We've always acknowledged that the intent was to convert the vehicle later and we've always acknowledged the reason for that, which is to obtain the lower duty. We did that on reliance on the decisions to say that condition as imported is the touchstone for classification analysis. I guess the real question is, is condition at importation confined to just the physical characteristics or do you look at the structure of the sale and the marketing and all of that? Other ancillary stuff, not on a post-importation look, but on a pre-importation look. Well, and I think that depends on what kind of heading this is. And this is not a use provision. This is an AO nominate provision that uses the language principally designed. But why does AO nominate, why is it only limited to physical characteristics? Is there a case law that says that? Because I get, I mean, we're looking at the time of importation. And if we were just looking at the physical characteristics, you have a really strong case. But I still don't understand why, particularly when we're looking at this unique provision that has principally designed for. I mean, I think if this just said passenger vehicles, you'd have a slam-dunk case because these are, you know, then it doesn't have any of this principally designed for. But with that language, don't you look at, in fact, aren't you compelled to look at the pre-importation record of what they were designed for? No, I don't think so, Your Honor. Because the way the court in Marabini and Western states import, the way the explanatory notes are written, and the way customs has construed it in every instance other than this case, is that what design refers to is not the intended business plan or ultimate sale of the importer. It is what is the physical design of the vehicle, what functions does that physical design perform, and what capability and suitability does the vehicle have as a result of those functions. And that is why not only in Western states import did this court reject any looking at subjective intent of the manufacturer or subsequent use. The explanatory notes are purely in terms of physical design characteristics, no reference to ultimate use or subjective intent. And the customs decisions entail this case likewise. And the most telling, I think, is the customs decision in the Dodge Sprinter case, because that was the photographic negative of this case. Dodge imported something in the condition... What does it matter that there may be customs rulings that support you? I mean, under Meade, those aren't entitled to Chevron deference. We're not suggesting that anything is entitled to deference here, Your Honor. But in terms of how the Marabini decision and this tariff language has been consistently construed prior to this case, the example I was going to mention was the Dodge Sprinter, which came in as a cargo van. But the Dodge company said to customs, we intend to put seats in it. We intend to put windows in it. We're going to make it to a shuttle van. Therefore, you should classify it as 8703. And customs said, no, none of that matters. The only thing that matters is condition as imported, because this is an AO nominee provision. So even though you intend to turn it into a passenger van, and that was uncontested, this is classified as 8704 for the transport of goods. In the red brief at 19, you talk about the importation in the Port of Baltimore and how eventually the assistant port director said that, I'm quoting from you, because the conversion was being done after release, it was, quote, okay. Tell us about that assistant port director. Was that a trained classification person? I'm not sure whether that assistant port director was, but trained classification analysts have looked at this throughout the two years prior to the decision here, when the Wall Street Journal first came out with the article. But you're citing to that, and I asked you that question. Right, and I believe the assistant port director at least supervised the classification people. I'm not sure whether the assistant port director was himself or herself a classification person. Okay, thank you, Mr. Professor. Thank you. Mr. Shi? Can you respond to the Dodge example he just cited? I mean, it does seem like the flip side of this, that it was they were importing them and intended to make them passenger vans, and maybe were sold as that, but at the time of importation they were cargo vans. So the Dodge Sprinter case is completely consistent with what Customs did here, and that's true for a couple of reasons. Number one, Customs did take the intent of the importer into account. Number two, Customs assessed the vehicle in its condition as imported, and in its condition as imported there weren't any spaces for passengers. And so notwithstanding the fact that there might have been some intent to convert a couple of these Sprinters into passenger vans, or a lot of these Sprinters into passenger vans, Customs came to the conclusion that that intent did not outweigh the fact that the structural and design features of the vehicle wouldn't carry passengers. So was that the case where some of them were sold, it was one model, and some of them came through and were converted, and some of them were still sold as cargo vans? So I don't know that, Your Honor, and the reason I don't is because the Sprinter decision, if you take a look at it, is about a paragraph long, and so it's really hard to determine what exactly Customs was basing its decision upon. But one thing we can know from the Sprinter decision is Customs did not say intent is irrelevant. Customs just said that intent in many circumstances, or, you know, in that circumstance, cannot override, given the other characteristics. That's why these were all nines coming across, and some of them were intended to be stripped out. Customs might have a hard time classifying the ones that were intended to be  passenger vans, assuming they met all the other characteristics. Yes, Your Honor. But, you know, the Sprinter. If for some reason you prevail today and Ford goes back to marketing one type of van and then offering post-importation processing to turn it into a cargo van, Customs may have a much harder way of capturing that. Yes, Your Honor, and as I said in my initial presentation, it's my understanding that at least some auto manufacturers do that. But to be emphatically clear, that is not what Ford did here. I see my red light is on, Your Honor. Okay. All right. Thank you, Mr. Sheehy. Thank you. Thank both counsel. The case is submitted.